## DEXTER HORTON & CO. v. SAYWARD.

### (Circuit Court, D. Washington. June 7, 1894.)

1. **CONTRACTS—INTERPRETATION.**

   In 1880 one M. owned a sawmill, a large quantity of timber land, and several vessels in which the lumber manufactured at the mill was shipped. This property was subject to numerous liens, by way of mortgage, judgment, and otherwise, some of which were in process of foreclosure or about to be foreclosed. M. sold the property to one S. Shortly after acquiring the property, S. went to C. & H., dealers in supplies, who had previously been furnishing supplies to the mill, and, after a conference with them and their attorney, gave them a written authority to furnish such supplies and money as were needed for the mill, and charge the same to the account of S. S. also appointed M. his agent, giving him general authority to protect his interests in the property. C. & H. furnished supplies to the mill, and also, from time to time, furnished money to pay off or buy up sundry liens upon the property, rendering monthly statements of account to M., as S.'s agent, showing such advances, which statements were entered in S.'s books at the mill, which were open to his inspection on frequent visits to the mill. This course of dealing continued for a long time. C. & H. assigned their claim to D., who brought an action against S. to recover the advances. It appeared that the written authority to S. had been lost, and its exact terms could not be proved. *Held*, that it was established by the evidence that such an authority to advance moneys needed for the mill had been given, and that, under the circumstances of the property at the time, such authority included advances for the purpose of paying off or avoiding foreclosure of liens.

2. **PRINCIPAL AND SURETY—JUDGMENT AGAINST SURETY AS EVIDENCE.**

   A judgment against a surety is at least prima facie evidence against the principal, though he was not notified of the action.

This was an action by Dexter Horton & Co. against W. P. Sayward upon an alleged contract of guaranty. Heard on defendant's exceptions to the report of a referee.

E. C. Hughes and E. F. Blaine, for plaintiff.
Battle & Shipley, for defendant.

BELLINGER, District Judge. On the 7th day of February, 1880, George A. Meigs was the owner of a tract of land at Port Madison, Wash., and sawmill and plant, of a capacity of from one to two hundred thousand feet of lumber daily, situate thereon. Prior to that date, the Meigs Lumber & Shipbuilding Company, a corporation, was organized by Meigs and others, he being the owner of a great majority of the stock, and the president, general manager, and agent of the corporation. The corporation owned large tracts of

timber lands, amounting to about 16,000 acres, in different counties of Washington, and a fleet of vessels used in the lumber trade, and was engaged in operating the sawmills and conveying the lumber manufactured to market by means of the vessels. Both Meigs and the Meigs Lumber & Shipbuilding Company became indebted in large amounts, to secure a part of which indebtedness Meigs and the company executed mortgages upon the property mentioned to E. Bourne, trustee, Bartlett Doe, and others. These liens, with others then existing, amounted to about $300,000. On February 7, 1880, suits were pending to foreclose certain of these mortgages, and an attachment had been levied upon the mill and plant and the Port Madison land at the suit of one Judson, upon a claim for about $20,000 against the Meigs Lumber & Shipbuilding Company. Two of the vessels, the Northwest and Tidal Wave, were also in custody of the court under other process, and were being navigated under its direction. Including the Judson action, there were cases pending against Meigs and the company involving an aggregate of about $250,000. Prior to this time, Dexter Horton & Co. had recovered a judgment against Meigs and the company, upon which there remained unpaid $10,974.40. F. M. Guye had also recovered a judgment against such parties, upon which there remained unpaid $1,905.29. Both of these judgments were liens upon the property of the judgment debtor. On February 7, 1880, Meigs, and the company, acting through Meigs, conveyed and assigned all the property of each of said parties to the defendant, Sayward, who was then, and has since continued to be, a resident of Victoria, British Columbia, but who was at the time at Port Madison, where he remained until about April 15, 1880. The consideration for the mill and plant and land at Port Madison was $5,000, which Sayward paid by his check for that amount, which check was given to one Wallace by Meigs, in satisfaction of a debt due the latter from Meigs for services at the mill. Wallace subsequently received out of the earnings of the mill the amount of his debt, whereupon he returned the check to Meigs, by whom it was returned to Sayward, unused. The consideration expressed in the deeds to the other property was $10. In addition to the check given and returned as just stated, Sayward paid, in consideration of these transfers to him, $10,000, in discharge of claims and liens against the property, $4,000 of which was in discharge of a salvage lien against one of the vessels of the fleet mentioned,—the Vidette. It is objected by the defendants that it does not appear that all this $10,000 was applied as here stated, but this is not material. Meigs and Sayward were old acquaintances, and had formerly been partners in business in Florida and California, and their relation appears to have been one of unusual confidence. Prior to these transfers, the firm of Crawford & Harrington, wholesale and retail dealers in groceries, provisions, and other merchandise at Seattle, had had dealings in the course of their business, with the lumber company under the name of the Port Madison Mills, and the mill company had on occasions consigned cargoes of lumber in the name of such firm as consignors to liquidate the indebtedness due the firm on account of such busi-

ness. These cargoes had been sold in San Francisco for account of such consignors, Crawford & Harrington, and the net proceeds of the sales credited to the account of the Port Madison Mills upon the firm books; the firm sending from time to time statements to Meigs showing the state of their account with the Port Madison Mills. Shortly after the transfer and conveyance to Sayward, Meigs came to Seattle, and informed Crawford & Harrington of the transfer, and presented an order from Sayward for supplies for the mill, stating that Sayward would come to Seattle in a few days, and make a further or permanent arrangement for supplies. As to this there is no dispute. Plaintiffs claim, and the referee finds, that Meigs at this time instructed Crawford & Harrington to charge all supplies furnished the mill from that date to Sayward, the defendant. This is denied by defendant. The question thus in dispute cuts no figure in the case either way. What took place at this time is only preliminary to what followed, in relation to which it has no special significance. Sayward subsequently did come to Seattle, accompanied by Meigs, and made an arrangement with Crawford & Harrington to furnish the mill with supplies and money, on the defendant's account. The plaintiffs claim and the referee finds that by this arrangement Crawford & Harrington were also authorized to advance such sums of money as should be required from time to time to pay off such indebtedness of Meigs and of the company as constituted liens on the property purchased by the defendant, and as threatened a sale of the property and the shutting down of the mill, which advances were to be charged to the defendant's account with other advances made; that a written order was given to Crawford & Harrington by the defendant which was intended to cover the advances that the firm was authorized to make on the defendant's account; and that this writing was destroyed in the Seattle fire of 1889. Defendant denies that such writing was ever executed, or that there was any authority from him for advances other than for current expenses. Crawford & Harrington made advances to pay current expenses of the mill and supplies therefor, and paid interest on certain judgments against the property, until November, 1880, when the firm was succeeded by Harrington & Smith, who continued to make advances of supplies furnished and moneys advanced to discharge lien debts of the property. Crawford & Harrington and their successors, Harrington & Smith, made advances of supplies and money for current expenses regularly, and also from time to time paid or purchased such judgments as were liens on the property, most of which were compromised at much less than their face, and forwarded to Meigs, who was defendant's agent in the conduct of the business at Port Madison, at the end of each month, itemized statements of all supplies and money so furnished and expended. There was a formal delegation of authority by the defendant to Meigs, under date April 7, 1880, as follows: "I appoint you agent, to protect my interests in lands, mill property, lumber, logs, rents, &c., and vessels, in my absence from Washington Territory." Meigs assumed the conduct of the business of the mills, and continued therein during all the time mentioned, as the agent of

the defendant. In these statements furnished to Meigs as stated, the defendant was debited with all supplies furnished and moneys advanced, and he was credited with all moneys received as the proceeds of cargoes consigned as aforesaid. The balance shown by each statement was carried forward, and became the first item in the next succeeding monthly statement. Three monthly statements so forwarded were each accompanied by a short letter explaining the respective statements, and expressing the wish that such statements would be found correct and would be satisfactory. When received, they were handed by Meigs to the bookkeeper of the defendant at Port Madison, who entered the substance of them in the defendant's books of account, kept in the name of Port Madison Mills. Whether the receipt of these statements or their entry in this way was known to the defendant is a disputed question. No objection was made by Meigs to any considerable item in these accounts, except as to the item of mill insurance. There was no objection to the charges made in the account for sums paid upon debts that were liens on the property. Crawford & Harrington and their successors, Harrington & Smith, took assignments of the judgments and liens in question. Plaintiffs explain this upon the theory that such assignments were merely to secure the moneys advanced on account of such liens, while defendant contends that the firm purchased such liens on their own account. The last monthly statement, which was rendered on September 30, 1891, showed a balance due to Harrington & Smith of $227,768.86. Prior to the commencement of this action, Harrington & Smith assigned this account to plaintiffs, who bring this action upon such account as upon an account stated.

The questions for decision arise upon exceptions filed by the respective parties to the report of the referee herein. The principal question in the case is as to the liability of the defendant for moneys paid on account of liens upon the property referred to. The referee finds that the defendant authorized Crawford & Harrington to advance such sums as might be necessary to discharge liens upon the property, and thus prevent its sale and the shutting down of the mill, and charge the same to his account. The defendant contends that this finding is not supported by evidence, and this presents the principal point of controversy in the case. If Harrington & Smith had this authority from the defendant, it was contained in the writing claimed to have been given them, and destroyed in the Seattle fire. If there was a writing intended to authorize such advances, its terms are conclusive as to the defendant's agreement respecting them. The plaintiffs, having alleged such a writing, must establish an agreement in the form and of the character alleged. I am of the opinion that there was a written authority of some character. The parties present when this writing was delivered were Crawford and Harrington, of the firm of that name, the defendant, Sayward, Meigs, Frank Hanford, bookkeeper of Crawford & Harrington, and Struve, the attorney of the firm of Crawford & Harrington. The time of the occurrence, according to plaintiffs' witnesses, was in February or March, 1880.

Frank Hanford's testimony is to the effect that the object of the meeting and conversation of the parties was to enable the defendant "to make arrangements with Crawford & Harrington to protect them in carrying the mill, meeting payments, and making advances"; that Crawford & Harrington, having theretofore made advances on account of the mill, had decided to make no more advances, after the transfer to the defendant, without some guaranty on defendant's part; that, for the purpose of arranging for such advances, the defendant and Meigs came to Seattle, when the meeting referred to was had; that defendant handed to Mr. Crawford or to Mr. Harrington a letter authorizing them to make advances, and charge the same to his account; that the defendant inquired if it (the writing) was satisfactory, and was answered by Mr. Crawford that it was. Mr. Hanford continues his testimony as follows:

"Then the conversation did not go into all the details, but the substance of it was that the mills should be able to carry those payments that were spoken of. Q. What payments? A. Those payments that had to be made on judgments according to a certain stipulation,—the Bourne judgment, the Horton judgment, and the Fish judgment, and other judgments which had been ——"

The witness was interrupted at this point by an objection, after which he continued as follows:

"And Mr. Crawford stated that those payments would be a large amount of money, and it was necessary to provide for them, and Mr. Sayward expressed full confidence that the mill would be able to take care of them as they became due, but in the meantime he became responsible for all these matters."

In his cross-examination the witness says the order was very brief; that "it was to the effect that the firm of Crawford & Harrington were authorized by that writing to advance whatever might be required to the Port Madison Mills, and charge that account to Sayward"; that it was a general authorization to make advances to the Port Madison Mills. The witness further said that he did not remember that any judgment was specifically referred to.

Mr. Harrington testifies as follows:

"Q. Now, will you state what was said between Mr. Sayward and yourself and Mr. Crawford at that time? A. Well, he wished us to go on furnishing the supplies and advancing the money for whatever amount Mr. Meigs needed to pay off the bills against the mills, such as judgments, etc., and he further sent a written order. But the order is now lost. I think it was lost during the fire. But it was a written order to Crawford & Harrington to supply them with what they required. Q. And how was it to be charged? A. To W. P. Sayward. The account was then and there charged to W. P. Sayward, and the bill sent every night, and at the end of the month a written statement was sent."

It was argued with much force that, where a party is to be charged for advances made solely on his agreement to repay the same, the testimony to establish such agreement should be direct and explicit; that the terms of the agreement should be proved with such directness that nothing is left to inference; that in this case the terms of the writing and the language used by the parties at the time, as testified to by Harrington and Hanford, are general, and are fully answered by advances for the ordinary expenses of the mill; that it cannot be gathered from this testimony that advances

to pay judgments were authorized, except as an inference drawn by these witnesses from the facts to which they testify. Assuming that the authority given to Crawford & Harrington was to advance whatever might be required to the Port Madison Mills, as testified to by Hanford and Struve, or that it was to advance the money for whatever amount Mr. Meigs needed to pay off the bills against the mills, as testified to by Harrington, this does not necessarily exclude advances to pay off judgments that were threatening the property. In other words, if the reference to judgments and liens in the testimony of these witnesses is treated as mere matters of opinion or inference on their part, and if it be accepted as the fact that the advances authorized were to be of whatever money or supplies were "required" or needed for the Port Madison Mills, there is no such fixed meaning in these words as excludes the advances in question. Of course, it does not follow that they were necessarily included. Thus considered, the language of the obligation leaves room for construction as to whether advances "required" or "needed" by the mill or by Meigs for the mill were intended to include those in dispute. "The situation of the parties at the time and of the property which is the subject-matter of the contract, and the intention and purpose of the parties in making the contract, will often be of great service in guiding the construction, because, as has been said, this intention will be carried into effect so far as the rules of language and the rules of law will permit." 2 Pars. Cont. 499.

At the time the arrangement in question was entered into between Crawford & Harrington and the defendant, the mill property was under mortgage to the aggregate amount of $300,000, and foreclosure suits were pending for the aggregate amount of above $200,000. There was also an attachment levied upon all the property in an action for $20,000, and two of the vessels of the concern were being navigated under legal custody. It was in such a state of the property that the defendant made the arrangement in question for advances of whatever amount Mr. Meigs needed to pay off the bills against the mill,—of "whatever might be required by the Port Madison Mills." It is not, in the nature of things, possible that at such a juncture the meeting of parties testified to could have been had to provide for the requirements of the mills without, at least, considering these lien debts and proceedings. The business could not continue without providing for liens as well as current expenses. There was equal necessity for provision for both requirements, and there was therefore equal reason why the defendant should assume responsibility for both. He could not safely assume large obligations for operating expenses unless the continued operation of the mill could be guarantied. On the other hand, Crawford & Harrington had as much reason to require a guaranty for advances of one kind as for another. True, they took assignments of such judgments as they provided for; but they also arranged for consignments to them of all product of the mills. If the security of the liens was sufficient to induce advances to discharge lien debts, the consignments provided for should have sufficed to secure advances for operating expenses. There was greater incentive to the owner

to guaranty advances to satisfy lien debts than there was for a third person to do so upon the security of such liens. Crawford & Harrington had only the consideration of keeping a customer for their merchandise. They were not lending for interest. That was not their business, and much of the money advanced by them to settle these judgments was obtained by paying discount, and was charged to the defendant, without anything being added for themselves. All interest charges were at current rates. It is in evidence that the defendant was of the opinion that the earnings of the mills would in a little time pay all debts; that this might be done in one good year. Crawford & Harrington had only the profits on sales of merchandise to the mill to compensate them for all these advances, while the defendant had the preservation of the property, which he thought capable of earning enough in one good year to pay all its debts. The advantage was enormously in his favor, as it appeared at the time. It is incredible that in such a situation there should have been a conference between the parties and a discussion of the means to provide for continuing the operation of the mills, ending in an agreement for such provision, without taking the foreclosure and attachment proceedings into consideration, or intending any provision for these and like demands. It is safe to conclude that the witness Hanford is not mistaken when he says: "I cannot say that any specific judgment was named that day; simply these lien claims. It was well understood, however, what they were." The object of the conversation was for Mr. Sayward to make arrangements with Crawford & Harrington to protect them in carrying the mill,—meeting payments and making advances. What was subsequently done in pursuance of this arrangement is conclusive as to how it was understood by the parties. The witness Hanford, following what is just quoted, says:

"It may be an inference, but, if you have a matter talked of in your presence and in your store for days and weeks at a time, it would make a strong impression. * * * It was a good while ago, and the impressions of the conversation are very distinct, while perhaps the language may not be. I remember very distinctly the circumstances, however, and the policy that was adopted by the house from that time in consequence of it."

It is not a valid objection to this testimony that the witness' recollection of what was agreed upon is re-enforced by what was done in pursuance of the agreement. The conduct of the parties in pursuance of an agreement, when good faith is conceded, may be safely relied upon in determining what is otherwise doubtful in the agreement. In this case the advances made on account of liens were charged in the monthly statements of account with other advances of money and merchandise. These accounts were entered in the books of the mill company. There was no objection from Meigs or from the defendant, except as to certain items not material to be considered in this connection. The balances from each month were carried into the succeeding statement. These advances began shortly after the arrangement in question, and more than 10 years before this suit was begun. The periodical statement of

account containing them furnished by the one party, and entered in the books of the other, and not objected to until this suit, more than 10 years later, may be regarded, from the nearness in their inception to the transaction in dispute, as in effect accompanying that transaction and explaining it. There is no escape from the effect of this account. It is argued that the defendant, being a resident in Victoria, was ignorant of the account. But, if so, he was ignorant under circumstances that attach to such ignorance the consequences of knowledge. He was, at Port Madison Mills at different times during the continuance of this account. His home is distant only a half day's journey. He was presumably in daily communication by mail with the agent, who was invested by him with full authority to "protect" his "interest in lands, mill property, lumber, logs, rents and vessels," and who, in pursuance of such or other authority, was actively engaged in the conduct of the business of operating such mills in his name. His business thus conducted and his property, which his agent was authorized by him to protect, were in the enjoyment of immunity from foreclosure and execution purchased by the money of Crawford & Harrington, advanced on his personal credit, and the fact was daily entered in the books of his business. Some of the judgments (the Dexter Horton and the Fish judgments), when fully paid for and assignments taken, were entered in the bills receivable account. The idea in this seems to have been that, when an assignment was taken, so much of the advances as the assigned judgments were security for should go into the bills receivable account, and that the judgments were not such security for previous advances of interest. The reason for this is not clear or satisfactory, but the fact furnishes no ground of inference that Crawford & Harrington bought the judgments on their own account to hold other than as security for advances made on account of them. As stated, prior advances on these judgments were charged in the monthly statements. The final payment advanced was entered on the debit side of the bills receivable account in the name of the defendant. In each case it equally appears that the advances were made on the account of the defendant. These accounts are, in my opinion, conclusive of the defendant's liability. So, too, is the transaction which authorized the account. The testimony of Hanford, Harrington, and Struve as to the written order is sufficiently explicit to justify the finding that the judgments and lien claims against the mills property were considered at the meeting in question, and that it was the understanding of the parties at the time that the order was authority for such advances; that they were such advances as would be "needed" by the mills,—as Meigs might "require" to "protect" Sayward's property while conducting the business of the mills.

It is suggested in the argument that these advances were made solely upon Meigs' authority, and the testimony of Harrington is quoted to show that such advances were so made in the mistaken belief that Sayward had given Meigs full power to act for him in procuring the advances to be made. If such is the fact, it is of doubtful advantage to the defendant. If the defendant did not

authorize the advances directly, at least he permitted Meigs to assume authority to do so, and to exercise it for many years. He could not have been ignorant of what was taking place. The books of his business were full of written evidence that these advances were being made on his personal credit. The writing by which he appointed Meigs as his agent was in words of general authority. If he did not directly or through Meigs authorize these advances, there must have been a collusive understanding between the two to induce, or at least permit, Crawford & Harrington to act upon the belief that Meigs was authorized to procure them. He knew they were being made, and on his credit. He could not have escaped information of the fact unless he purposely went out of his way to do so, in which case knowledge is implied. Crawford & Harrington's belief that Meigs had the authority testified to by Harrington is consistent with the personal guaranty claimed to have been given by the defendant. There is no inference that Crawford & Harrington were to go about hunting up judgment and other lien claims, and making payments thereon. Their agreement with Sayward, as testified to by Harrington, was to advance money to whatever amount "Mr. Meigs needed" to pay off the bills against the mills; or, as testified to by Hanford and Struve, "to advance whatever might be required." The parties might properly assume—and I believe the fact to be—that Meigs was fully empowered to make requisitions for advances from time to time, to make adjustments and settlements of pressing claims. There was no reason for making a distinction between old debts and new ones. There was imperative necessity to provide for both. The property might have been as easily, and probably with less delay, sold upon an existing judgment as upon a new debt. The taking of assignments of these judgments by Crawford & Harrington is claimed by the defendant as evidence that the advances made on account of such judgments were an investment made upon their own motion; but the referee finds that this course was adopted as a result of a consultation among the attorneys of Meigs and the Meigs Lumber Company and the defendant, and that this was done "to preserve the lien of said judgments as a security for the persons making the payments." This finding is not challenged, except that the objection is made to it that Crawford & Harrington's attorney was also present at such consultation. Judge Lewis, a witness called in behalf of the defendant, gives an account of this consultation and of the circumstances attending it. He was defendant's attorney at the time. He says that in the early part of the litigation (the suits pending against the mills property) it became necessary for him to satisfy his own mind about something. What this was he does not remember. This was not later than 1881. He went over to Crawford & Harrington's, or perhaps to Harrington & Smith's (he does not know whether the firm had changed at this time), for the purpose of seeing a written authority or direction that Mr. Sayward had said he had given to them in relation to some business matters. The paper was found, and was in the

shape of a letter. Lewis looked at it. It was short. He cannot say what was in it at all, but he satisfied himself as to what he wanted to know very quickly. He is able to fix March 9, 1881, as the date of this occurrence, by a praecipe which he filed in the consolidated case immediately after this, and which therefore appears to have some relation to the examination of the authority that Sayward told Lewis he had given Crawford & Harrington. In the same connection, Lewis says there was a consultation held by the attorneys of Meigs, the Meigs Lumber & Shipbuilding Company, Sayward, and Crawford & Harrington to determine, "if these judgments were paid by any one, whether they could hold the judgments as security in their name." The witness continues:

"And the conclusion was reached by us that we could do that, and thereupon I went up to the courthouse, and filed a praecipe, telling them simply to file or note the receipts on the appearance docket, and not to give them as a credit, so as not to cancel the judgment; and that is the reason for the memorandum here."

The relation which the "something" that it became necessary for Judge Lewis to satisfy his mind about seems to bear to the foreclosure suits and to the written authority or direction given by the defendant to Crawford & Harrington, according to defendant's own statement to Lewis, and which these bear to the consultation that followed and to the praecipe, is suggestive. There was no written authority or direction from defendant to Crawford & Harrington, according to defendant's contention, other than the order for supplies (until such time as permanent arrangements could be made, known as the "temporary order"); and this writing has no such importance as answers the requirements of an "authority" that defendant would be likely to inform his attorney about, and as that attorney would find it necessary to examine with reference to dealing with judgments against the mills. These statements by Judge Lewis point to such an authority as plaintiffs say was given by defendant to Crawford & Harrington to advance money to provide for liens against the property. Judge Lewis says he was the attorney of the mill company, Meigs, and the defendant in the matter of the consolidated suit. Presumably, the communication made to him by defendant as to a written authority given by him to Crawford & Harrington in some way related to such suit. Lewis seems to have referred to it in that connection. The consultation as to having the debts assigned so as to preserve the liens in favor of those advancing the money (Crawford & Harrington) followed the examination of the written authority mentioned. If not a consequence of that examination, it was an incident of an occurrence common to both. The fact that the witness fixes the date of his examination of the writing given by Sayward, the defendant, to Crawford & Harrington, by the date of the written directions he gave the clerk to file the receipts for money paid on the judgments, and not to cancel the judgments, shows pretty conclusively that the writing given by Sayward to Crawford & Harrington related to these judgments. All this goes to show that not only the assignment of judgments was intended as a security, but that there was

a writing given by the defendant authorizing advances to pay liens.

The defendant had an interest in preserving the liens of these judgments in friendly hands. Hanford explains as one of the considerations for what was done that by such assignments Crawford & Harrington could use the judgments, so that no one else could "obtain any judgment and come in and close out the property." The stipulation or agreement executed by Lewis as attorney for the defendant in January, 1883, by which the defendant promised and agreed to pay the Dexter Horton judgment of above $10,000, shows that Crawford & Harrington were not undertaking to provide for the lien claims by purchasing them on their own account. So, too, of the Pemberton mortgage, executed by Sayward by his own hand, to provide some $30,000 with which to pay such claims. By the provisions of this mortgage, the defendant expressly obligated himself to pay the debt secured.

In the Judson suit, brought by Harrington & Smith to compel an assignment to them of the judgment held by Judson, plaintiffs alleged their agreement with defendant in effect as these plaintiffs allege it now. They allege advances at different dates of money to pay off liens and incumbrances, and that such advances were at Sayward's special instance and request. Sayward was a party defendant therein. He made no answer. It is said, however, that in the Boyd-Stevens suit, brought by creditors of the mills to set aside the conveyances to the defendant, the defendant denied that he had assumed payment of the mill debts, or had become bound to pay them. It is not claimed that he assumed these debts. His arrangement with Crawford & Harrington for such advances of money as might be required to provide for liens bears no resemblance whatever to an assumption of an obligation to the creditors to pay such liens. Judge Lewis testified that he drew a check as attorney for defendant for $766.86, to pay interest on judgments represented by McNaught (what he did was to indorse an order for such payment upon a check drawn by Meigs, which is in effect as he testifies); and, in explanation of the reasons for so doing, he testifies that there was a general understanding that in case of an emergency he was to call on Crawford & Harrington or Harrington & Smith for any money that might be required, and that, when he drew the check in question, there was a great emergency; that it was a case of urgent necessity, "because Greene had his hands on us, and McNaught had his fins on us."

The accommodation had by Smith & Harrington of the defendant on two or more occasions of their temporary embarrassment are urged as evidence that Sayward was not then a debtor of the firm. The argument has force; yet the fact is not a conclusive one. I conclude that the arrangement entered into was in the expectation of all the parties that the mill would pay all the obligations assumed, and that it would not be necessary for defendant to make payments out of other funds; that it was tacitly understood that he should stand, as to the advances to be made, as a surety, and that he would not be called upon until there was a failure of payment

out of the business; that Crawford & Harrington were desirous of helping the business upon such a footing. Under such circumstances, it would not be unusual if they called upon the defendant in the manner referred to. On the contrary, the fact of his liability to them may furnish a reason for calling on him as they did. However this may be, I cannot consider the various circumstances in the case relied upon, as conflicting with the conclusions found by the referee. The most that can be said is that these objections create a conflict in the evidence, and in such case the findings, if fairly supported by evidence, must stand.

It is argued that the bill of sale made on April 2, 1880, by defendant to Crawford & Harrington, to secure about $4,000 for merchandise advanced and future advances, is inconsistent with the existence of any previous arrangement for such advances. It is not improbable that, as claimed by plaintiffs, the arrangement in question was not made in February, 1880, as testified to by their witness in the opening of their case, but was subsequent to the bill of sale. If the case was otherwise doubtful, the argument of defendant from this fact might be conclusive of the question. But it is abundantly established that there was a guaranty to Crawford & Harrington by the defendant early in the year 1880 for advances, at least, of merchandise and current mill expenses, whatever of doubt there may be as to advances on judgments; whereas the bill of sale, in the inference drawn from it, is against any guaranty whatever. I mean by this statement that such fact is testified to directly and with positiveness by Hanford, Struve, and Harrington, and a finding upon such testimony cannot be disturbed on this motion, but must be held as conclusive of the fact found.

The money advances for insurance upon the mill were not within the terms of the order relied upon. As already stated, the authority to Crawford & Harrington to make advances was limited to such advances as Meigs, as the representative of defendant, should require. The insurance was effected without the consent of Meigs, and the charge therefor was against his protest. The question as to whether the insurance was to the defendant's benefit is immaterial. It was to the interest of Harrington & Smith, who looked to the insured property as security for what they had advanced on the defendant's account, that the property should be insured. Whatever the financial standing of the defendant may have been, the evidence warrants the conclusion that the property of the mills company was all the property he had within the United States, and therefore all the property to which they could have recourse under a process issued against him out of the courts of this country. The protection of this security was made more important by this fact, and was sufficient inducement for the advances of insurance made on this account. If the fact was otherwise, it would make no difference. The defendant could not be made the debtor of Harrington & Smith without his authority, and against the protest of his agent.

It is claimed by plaintiffs that the discount charged in the account sued on means the interest which plaintiffs' assignors were

compelled to pay to get the money advanced to defendant's use, as charged in the account. If this discount is in fact interest, it is but equitable that it should be allowed. If it is in fact interest upon advances charged in the account, as claimed, the manner in which such discount charges are arrived at should appear from the account, or at least from the evidence in connection with the account. The referee is unable to discover the manner in which these discount items were ascertained. I have the same difficulty. It does not help the matter to call the discount items "interest." Given this name, and some of these charges show the principal upon which the interest is charged and the rate of the charge. From this the time for which the charge is made is ascertained. Other of the charges show the time charged for, from which the principal sum may be calculated. The larger part of the items consist of lump sums charged as "discount" (interest), without anything to show the amount upon which this is figured or the time covered by it. On May 31, 1882, there is a charge of discount of $86 upon $5,734, at 1½ per cent. The cash advanced for that month, as appears from the account, is not $5,734, but very nearly $1,000 less. It might be inferred from this and the explanation given in the evidence that Harrington & Smith borrowed that amount at the bank to provide for advances, paying the discount charged. If so, the discount is not upon what was actually advanced, but upon what they expected to advance. I am satisfied that, as a matter of equity, Harrington & Smith were entitled to something in the way of these charges, but the state of the account makes it impossible to ascertain what that something is. If these items are called "interest," there is nothing in the account or the evidence to make them a legal charge against the defendant.

The Cochrane & Day litigation grew out of a dispute as to the quantity of logs sold by Crawford & Harrington for Cochrane & Day to Meigs, as the agent of defendant. Meigs scaled the logs, and reported the measurement at 478,861. The price allowed was $4.50 per thousand, being a total of $2,154.87. This amount was charged to the defendant by Crawford & Harrington. Cochrane & Day disputed the measurement and price, and brought an action against Crawford & Harrington to recover the value of the logs. They prevailed in the litigation, and recovered $3,627, instead of the $2,154.87 for which Crawford & Harrington had sold the logs to the defendant. The plaintiffs seek to charge the defendant with the difference between these amounts, and with all the costs and charges, including attorneys' fees, paid by Crawford & Harrington in the litigation. Plaintiffs claim that Meigs practiced a fraud in measuring the logs. Assuming that such fact would be conclusive upon the defendant, how can it be determined here that the fact is as charged? The adjudication between Crawford & Harrington and Cochrane & Day does not bind the defendant. More than half the entire charge in dispute consists of expenses incurred by Crawford & Harrington in an unsuccessful endeavor to maintain the correctness of the measurement and price at which they sold the logs to the defendant. The Cochrane & Day judgment cuts no figure

here.  If the logs were undermeasured or sold below their value, the parties affected thereby might have corrected the mistake in the account as to this.

What is known as the "Haller Judgment" presents an important question in the case.  Crawford & Harrington were parties of the one part, with Meigs and the defendant, in a contract with Haller, made for the benefit of the lumber company and defendant, as the transferee of the property of the company.  As found by the referee, the true position of Crawford & Harrington in the contract was that of sureties to Meigs and the defendant.  Haller brought an action upon this contract, and recovered judgment against Crawford & Harrington and Meigs in the sum of $15,548, which sum Crawford & Harrington paid.  The defendant was a party defendant, but was not served with process.  This judgment is, at least, prima facie evidence of the defendant's liability.  Crawford & Harrington could have maintained an action upon it against the defendant to compel him to indemnify them for the recovery against them.  Whether in such action the judgment would have been conclusive evidence of the defendant's liability it is not necessary to determine.  It is settled that a judgment against a surety is prima facie evidence against the principal, although the latter had no notice of the action.  Such judgment is conclusive where the principal had notice of the action.  The finding that the position of Crawford & Harrington was that of sureties in the Haller contract is excepted to by defendant.  But the finding, except as to that part of it which finds that the logs delivered under the contract were sawed into lumber at defendant's mill and for his benefit, is merely a conclusion from other findings not excepted to, and abundantly established by the evidence.  These unchallenged and established findings show that the relations of Crawford & Harrington to the subject-matter of the contract were those of suretyship.  Upon the case thus made, Crawford & Harrington could have maintained an action against the defendant for the amount recovered against them on the Haller judgment, and their successors in interest can maintain such action now.  Such right is not defeated by the fact that Crawford & Harrington have paid such judgment.  On the contrary, payment is necessary to such right.  Nor does it make any difference that Harrington & Smith paid to the holder of the judgment the one-half for which Harrington, as between himself and his cosurety, was liable, and debited Harrington with it in his private account with the firm.  Defendant says in his brief that this fact, with other facts, shows that there was no intention to look to the defendant for reimbursement for the amount paid.  If the fact of the obligation of the defendant was open to dispute, anything that evidenced an intention not to look to the defendant would be pertinent.  But there is no room to question defendant's liability upon the contract in question, and, of course, this liability is not discharged or waived by the fact that Crawford & Harrington paid their guaranty, or by the manner of payment, or by any intention there may have been on Harrington's part at any time respecting it.  Moreover, the procuring of the money with which to pay

his part of this judgment by Harrington from Harrington & Smith, or the fact that the firm made payment for Harrington, in no way tends to show that Harrington did not intend to look to the defendant to reimburse him for the payment which he was thus compelled to make. In so far as the obligation thus created has passed by assignment to plaintiffs, they are entitled, upon the facts found by the referee, to recover therefor in this action.

The several exceptions of both parties to the findings of fact by the referee are overruled, and upon such findings it is ordered that plaintiffs have judgment against the defendant for the sum of $153,128.89, with interest thereon from September 30, 1891.